**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

METROPLEX COMMUNICATIONS, INC.,     )
on behalf of itself and all others similarly situated,   )
                           )    Case No. 3:22-cv-1455
     Plaintiff,             )
                           )    JURY TRIAL DEMANDED
     v.                 )
                           )
META PLATFORMS, INC.,        )
                           )
     Defendant.           )

## CLASS ACTION COMPLAINT

Plaintiff, Metroplex Communications, Inc. ("Metroplex"), on behalf of itself and on behalf of all others similarly situated, for its Complaint against Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., (referred to herein as "Meta" or "Facebook"), states as follows:

## NATURE OF THE ACTION

1.    This lawsuit seeks redress under the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act for Meta's false and misleading statements in its advertising and promotions regarding the amount of people on the Facebook platform and its statements about potentially and actually delivering advertisements to people.

2.    At its core, Meta, formerly known as Facebook, Inc., is an advertising company.

3.    Meta primarily generates revenue by selling digital advertisements for placement on the Facebook platform.

4.    Metroplex, a competitor of Meta, also sells advertisements to businesses seeking to reach consumers.

5.    The law permits and encourages competition between businesses, but both federal and Illinois state law prohibit *unfair* competition—and that is the genesis of this lawsuit. Metroplex

brings claims of unfair competition on behalf of itself and a class of similarly situated competitors of Meta.

6.     Throughout the relevant time period, Meta has made false and/or misleading statements regarding the metrics material to consumers considering purchasing advertisements from Meta—including, but not limited to, understating the number of duplicate accounts, understating the number of false accounts, overstating the number of monthly active users in the United States and Canada, and overstating and falsely describing the potential reach, estimated audience size, and achieved reach of advertising campaigns.

7.     Meta made these false and/or misleading statements for the purpose of, *inter alia*, influencing potential advertisers to buy, and to continue buying, the main product Meta sells: digital advertising.

8.     Meta has been paid hundreds of billions of dollars for digital advertising over the past three years and, as such, has become one of the world's most valuable companies. As a result of Meta's false and/or misleading statements, however, Metroplex and the class of similarly situated competitors have been, and/or are likely to be, injured by diversion of their sales to Meta, or by lessening of the goodwill associated with their products in light of the false and/or misleading statements Meta has made, and continues to make, about its audience size and delivery of advertisements to people.

## THE PARTIES

9.     Metroplex is an Illinois corporation with its principal place of business in Illinois. It is, therefore, a citizen of Illinois. Metroplex offers advertising services to businesses. It sells and places digital and targeted advertisements on its local news website, advantagenews.com, and the "Best of Edwardsville" website, sells radio advertisements for its stations 94.3 FM, 107.1 FM, and

1570 AM, and print advertisements that are placed in local newspapers and in the "Best of Edwardsville" magazine.

10.     Meta is a Delaware corporation with its principal place of business in California. It is, therefore, a citizen of Delaware and California.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Meta because Meta purposefully directs its activities at residents of Illinois and this litigation arises out of, or relates to, Meta's contacts with Illinois.

12.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Metroplex's claims arising under federal law. Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), this Court has original jurisdiction over Metroplex's claims because Metroplex and Meta are citizens of different states, the total claims of Class Members exceed $5,000,000 exclusive of interest and costs, and there are at least 100 Class Members. The Court has supplemental jurisdiction over Metroplex's state law claim pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to each claim occurred within this judicial district or because this Court has personal jurisdiction over Meta.

## FACTUAL ALLEGATIONS

14.     Meta owns and operates the social media platform, Facebook.

15.     At its core, Meta is a digital advertising company. As self-described in its most recent Annual Report filed with the United States Securities and Exchange Commission ("SEC"),

"We generate substantially all of our revenue from advertising. The loss of marketers, or reduction in spending by marketers, could seriously harm our business."[1]

16.     In 2021, Meta generated nearly $115 billion in advertising revenue.[2]

17.     In 2021, more than $48 billion of Meta's revenue originated in the United States.[3]

18.     In its public filings with the SEC, Meta readily acknowledges it competes with companies like Metroplex: "We compete with companies providing connection, sharing, discovery, and communication products and services to users online, as well as companies that sell advertising to businesses looking to reach consumers and/or develop tools and systems for managing and optimizing advertising campaigns."[4]

19.     Meta acknowledges to federal regulators and its shareholders the vast competition it faces within the marketplace: "We face significant competition in every aspect of our business . . . ."[5]

### Meta Markets itself as a Real Identity Platform

20.     Meta has long represented that it requires users to have just one master account that must be connected to a real person.

21.     According to Meta, this policy helps prevent impersonation and scams.

22.     Because of this, Meta has characterized itself as a "real identity platform" that bars users from having multiple personal accounts. As Kirthiga Reddy, the head of Facebook India,

---

[1]   Meta   2021   10-K,   p.   15,   https://www.sec.gov/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm.
[2] *Id.* p. 65.
[3] *Id.* p. 94.
[4] *Id.* p. 7.
[5] *Id.* p. 7.

explained in 2014: "[W]e are a real identity platform. We have a whole team making sure we keep that trust."[6]

23.     Thus, Meta states: "Authenticity is the cornerstone of our community. . . . [W]e require people to connect on Facebook using the name they go by in everyday life. Our authenticity policies are intended to create a safe environment where people can trust and hold one another accountable."[7]

24.     Accordingly, even where a business or entity has a Facebook page, that page is connected to a real person's account (or the accounts of multiple real people).

25.     The perception that advertisements will reach real people is material to consumers deciding whether to purchase advertisements from Meta or to instead purchase advertisements from a competitor of Meta.

### Meta's Annual Disclosures of Monthly Active Users

26.     When a consumer is considering purchasing advertisements on Meta platforms, Meta directs them to review Meta's quarterly and annual public filings for relevant information regarding users on Meta's platforms.[8]

27.     Meta's annual public filings provide "key metrics" about its users, "which include daily active users (DAUs), monthly active users (MAUs), and average revenue per user (ARPU)."[9]

---

[6] Shelley Singh & Chaitali Chakravarty, "Buying likes is not a valid business model: Kirthiga Reddy, FB India head" *The Economic Times*, Feb. 4, 2014, https://economictimes.indiatimes.com/opinion/interviews/buying-likes-is-not-a-valid-business-model-kirthiga-reddy-fb-india-head/articleshow/29843614.cms.

[7]     https://transparency.fb.com/poicies/community-standards/account-integrity-and-authentic-identity/ (last visited June 27, 2022).

[8] https://www.facebook.com/business/help/1665333080167380?id=176276233019487 (last visited April 12, 2022).

[9]     Facebook 2018 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm; Facebook 2019 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680120000013/fb-12312019x10k.htm (same); *see also* Facebook 2020 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680121000014/fb-20201231.htm (explaining key metrics are "based on user activity only on Facebook and Messenger and not on our other products"); Meta 2021 10-K, p. 4, https://www.sec.gov/ix?doc=/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm (same).

The numbers for these key metrics "are calculated using internal company data based on the activity of user accounts."[10]

28.     Meta further states that "these numbers are based on what [it] believe[s] to be reasonable estimates of [its] user base for the applicable period of measurement," and it is "continually seeking to improve [its] estimates of [its] user base, and such estimates may change due to improvements or changes in [its] methodology."[11]

29.     Meta defines a MAU as "a registered and logged-in Facebook user who visited Facebook through [Facebook's] website or a mobile device, or used [Facebook's] Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement."[12]

30.     Although Meta owns other platforms, such as Instagram, it has "historically reported the numbers of [its] daily active users (DAUs), monthly active users (MAUs), and average revenue per user (ARPU) (collectively, [its] 'Facebook metrics') based on user activity only on Facebook and Messenger and not on [its] other products."[13]

31.     Thus, Meta explains that "[t]he numbers of DAUs and MAUs discussed in this Annual Report on Form 10-K, as well as ARPU, do not include users on Instagram, WhatsApp, or our other products, unless they would otherwise qualify as DAUs or MAUs, respectively, based on their other activities on Facebook."[14]

32.     On January 31, 2019, Facebook filed an Annual Report with the SEC, also known as a Form 10-K, for the fiscal year ending December 31, 2018 ("2018 10-K").

---

[10] Facebook 2018 10-K, p. 4; Facebook 2019 10-K, p. 4; Facebook 2020 10-K, p. 4; Meta 2021 10-K, p. 4.
[11] *Id.*
[12] Meta 2021 10-K, p. 57; Facebook 2020 10-K, p. 55; 2019 10-K, p. 46; 2018 10-K, p. 37.
[13] Meta 2021 10-K, p 4; Facebook 2020 10-K, p. 4; Facebook 2019 10-K, p. 4. Messenger refers to Facebook Messenger, a messaging app that is associated with a person's Facebook account.
[14] Meta 2021 10-K, p. 6; Facebook 2020 10-K, p. 5; Facebook 2019 10-K, p. 5; Facebook 2018 10-K, p. 4.

33.     The 2018 10-K stated that, between December 31, 2017 and December 31, 2018, MAUs in the United States and Canada grew from 239 million to 242 million.

34.     On January 29, 2020, Facebook filed with the SEC a Form 10-K for the fiscal year ending December 31, 2019 ("2019 10-K").

35.     The 2019 10-K stated that, between December 31, 2018 and December 31, 2019, MAUs in the United States and Canada grew from 242 million to 248 million.

36.     On January 27, 2021, Facebook filed with the SEC a Form 10-K for the fiscal year ending December 31, 2020 ("2020 10-K").

37.     The 2020 10-K stated that, between December 31, 2019 and December 31, 2020, MAUs in the United States and Canada grew from 248 million to 258 million.

38.     On February 2, 2022, Meta filed with the SEC a Form 10-K for the fiscal year ending December 31, 2021 ("2021 10-K").

39.     The 2021 10-K stated that, between December 31, 2020 and December 31, 2021, MAUs in the United States and Canada grew from 258 million to 262 million.

## **Duplicate and False Accounts**

40.     For years, including in their 2018, 2019, 2020, and 2021 Forms 10-K, Facebook and Meta have acknowledged that a portion of Facebook accounts are what they characterize as "duplicate" and "false" accounts.

41.     Meta defines "[a] duplicate account [a]s one that a user maintains in addition to his or her principal account."[15]

42.     Meta "divide[s] 'false' accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human

---

[15] Meta 2021 10-K, p. 5; Facebook 2020 10-K, p. 5; Facebook 2019 10-K, p. 4; Facebook 2018 10-K, p. 4.

entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) violating accounts, which represent user profiles that we believe are intended to be used for purposes that violate our terms of service, such as bots and spam."[16]

### Since 2018, Meta Has Repeatedly Reported that, of its Worldwide Monthly Average Users, Approximately 11% are Duplicate Accounts

43.     Given its participation in the marketplace as a company that sells advertising in competition with other companies that sell advertising, Meta is aware that the number of duplicate accounts on its platform is a metric that influences consumers purchasing advertising and, therefore, Meta's bottom line.

44.     In its 2015 10-K, Meta reported that approximately 5% of its worldwide MAUs were duplicate accounts, and suggested that the percentage of duplicate accounts in the U.S. was lower than the worldwide figure:

> We estimate, for example, that "duplicate" accounts (an account that a user maintains in addition to his or her principal account) may have represented less than 5% of our worldwide MAUs in 2015. . . . We believe the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom and higher in developing markets such as India and Turkey.[17]

45.     In its 2016 10-K, Meta increased this estimate by 1%, reporting that approximately 6% of its worldwide MAUs were duplicate accounts, and again suggested that the percentage of duplicate accounts in the U.S. was lower than the worldwide figure:

> In 2016, we estimate that "duplicate" accounts (an account that a user maintains in addition to his or her principal account) may have

---

[16] Meta 2021 10-K, p. 5; Facebook 2020 10-K, p. 4 (same); Facebook 2019 10-K, p. 4 (same); Facebook 2018 10-K, p. 4 (same, except referring to "(2) undesirable accounts . . . such as [for] spamming" rather than "(2) violating accounts . . . such as [for] bots and spam").

[17] Facebook 2015 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680116000043/fb-12312015x10k.htm.

> represented approximately 6% of our worldwide MAUs. . . . We believe the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom and higher in developing markets such as India and Turkey.[18]

46.     In its 2017 10-K, Meta increased this estimate by 4%, reporting that approximately 10% of its worldwide MAUs were duplicate accounts, and again suggested that the percentage of duplicate accounts in the U.S. was lower than the worldwide figure:

> In the fourth quarter of 2017, we estimate that duplicate accounts may have represented approximately 10% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as India, Indonesia, and the Philippines, as compared to more developed markets.[19]

47.     In every annual report since 2018, Meta has reported that approximately 11% of its worldwide MAUs are duplicate accounts, and suggested that the percentage of duplicate accounts in the U.S. was lower than the worldwide figure:

> In the fourth quarter of 2018, we estimate that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.[20]

> In the fourth quarter of 2019, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.[21]

> In the fourth quarter of 2020, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully

---

[18]  Facebook 2016 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680117000007/fb-12312016x10k.htm.
[19]  Facebook 2017 10-K, p. 4, https://www.sec.gov/Archives/edgar/data/1326801/000132680118000009/fb-12312017x10k.htm.
[20] Facebook 2018 10-K, p. 4.
[21] Facebook 2019 10-K, p. 4.

higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.[22]

In the fourth quarter of 2021, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets.[23]

48.     Meta's SEC filings do not state whether the number of MAUs it reports annually is inclusive of, or exclusive of, the reported 11% of duplicate accounts.

### Since 2018, Meta Has Repeatedly Reported that, of its Worldwide Monthly Average Users, Approximately 5% are False Accounts

49.     Given its participation in the marketplace as a company that sells advertising in competition with other companies that sell advertising, Meta is aware that the number of false accounts on its platform is a metric that influences consumers purchasing advertising and therefore Meta's bottom line.

50.     In every annual report since 2018, Meta has reported that approximately 5% of its worldwide MAUs are false accounts:

In the fourth quarter of 2018, we estimate that false accounts may have represented approximately 5% of our worldwide MAUs.[24]

In the fourth quarter of 2019, we estimated that false accounts may have represented approximately 5% of our worldwide MAUs.[25]

In the fourth quarter of 2020, we estimated that false accounts may have represented approximately 5% of our worldwide MAUs.[26]

In the fourth quarter of 2021, we estimated that false accounts may have represented approximately 5% of our worldwide MAUs.[27]

---

[22] Facebook 2020 10-K, p. 4.
[23] Meta 2021 10-K, p. 5.
[24] Facebook 2018 10-K, p. 4.
[25] Facebook 2019 10-K, p. 4.
[26] Facebook 2020 10-K, p. 4.
[27] Meta 2021 10-K, p. 5.

51.     Meta's SEC filings do not state whether the number of MAUs it reports annually is inclusive of, or exclusive of, the reported 5% of false accounts.

**Reach**

52.     At all relevant times, to purchase advertisements on Meta, a consumer was required to use Meta's "Ads Manager" platform.

53.     Meta describes Ads Manager as "an all-in-one tool for creating ads, managing when and where they'll run, and tracking how well [a consumer's] campaigns are performing towards [its] marketing goals."[28]

54.     Prior to approximately March 2022, when an advertiser initiated an advertising campaign on Meta, the first step on Ads Manager required the user to choose a campaign objective.

55.     One objective that Meta offered was called "Reach." Meta explained that this objective helps the advertiser "Show your ads to the maximum number of people," as reflected in the screenshot below:



---

[28] https://www.facebook.com/business/tools/ads-manager (last accessed April 24, 2022).

56.    Meta further defined "reach" as "[t]he number of ***people*** who saw your ads at least once. Reach is different from impressions, which may include multiple views of your ads by the same people."[29]

57.    Upon information and belief, this definition of "reach" did not change during the Class Period.[30]

58.    On or about March 31, 2022, Meta removed "Reach" as a campaign objective. Meta's website explained that it "consolidated the campaign objectives to make it easier to find one that aligns with your business goals," as reflected in the screenshot below:



59.     The "Learn More" link above indicates that the "Previous Objective Name" of "Reach" now aligns with the "New Objective Name" of "Awareness."

**<u>Potential Reach (through late October 2021)</u>**

60.     After selecting its advertising campaign objective, the advertiser utilized Meta's Ads Manager to identify its advertising targets, including the demographics of the desired target audience.

61.      Prior to approximately late October 2021, after advertisers selected their targeting and placement criteria, the Ads Manager displayed a "Potential Reach" for the advertisement.

62.     Potential Reach was one of only a few metrics provided to the ad-buyer prior to purchasing ads, and the only metric regarding the estimated size of the target audience that Meta provided prior to purchasing ads.[31]

63.     Meta explained, "Potential reach is an estimation of how many ***people*** are in an ad set's target audience."[32]

64.     The Potential Reach was expressed as a number of ***people*** that the ad may reach, as in the following example:



---

[31] Meta also provided a metric called "Estimated Daily Reach," later revised to "Estimated Daily Results – People Reached," which was based in part on the Potential Reach, and which provided "an idea of how many of the people in your target audience you may be able to reach on a given day."
[32] https://web.archive.org/web/20190109200528/https://www.facebook.com/business/help/1665333080167380 (emphasis added). In March 2020, Meta revised its definition of Potential Reach slightly: "Potential Reach estimates how many ***people*** your ad could potentially reach depending on the targeting and ad placement options you select while creating an ad." https://web.archive.org/web/20200429194212/https://www.facebook.com/business/help/1665333080167380 (emphasis added).

65.     When an advertiser clicked on the "(i)" icon next to the Potential Reach figure, a popup window stated, "Estimates are based on the placements and targeting criteria you select and include factors like Facebook user behaviors, user demographics and location data. They're designed to estimate how many ***people*** in a given area could see an ad a business might run. They're not designed to match population or census estimates. Numbers may vary due to performance reasons. Learn More." (emphasis added and blue color in original).

66.     When an advertiser clicked on "Learn More," the website stated: "Potential reach is an estimation of how many ***people*** are in an ad set's target audience. . . . It updates in real time as you create or edit your ad set to help you understand how your targeting and placement choices affect the number of ***people*** you could reach." (emphasis added).

67.     Prior to approximately late October 2021, the default Potential Reach number, before any targeting criteria were selected, was the Potential Reach for people in the United States aged 18 and up, which was shown during the Class Period to be more than 200 million people.

68.     As targeting criteria was selected, the Potential Reach was revised accordingly.

69.     Prior to approximately mid-March 2019, Meta calculated the Potential Reach using its MAU data.

70.     Meta did not disclose whether the Potential Reach figure that it provided excluded or included double-counting people with duplicate accounts or included "people" with false accounts.

71.     In approximately mid-March 2019, Meta announced, "Potential reach was previously calculated based on the number of total monthly active users on Facebook. . . . Now

we're only including people in potential reach who were shown an ad on Facebook in the last 30 days."[33]

72.     Based on this change, the number reflected in Potential Reach was likely to decline because it would be a subset of Monthly Active Users who, in the last 30 days, had been shown an ad as opposed to the larger number of total Monthly Active Users on the Facebook platform.

73.     In or about mid-March 2019, Meta also added language on its Help Center description of Potential Reach stating, "Estimates . . . may differ depending on facts such as: How many accounts are used per person . . . ."

74.     While this change indicated that one person could have multiple accounts, Meta still stated the Potential Reach was a measure of "people," not accounts, and Meta continued to fail to disclose whether the Potential Reach figure included double-counting people with duplicate accounts or included "people" with false accounts.

75.     After these changes to Meta's statements, the default Potential Reach number, before any targeting criteria was selected, remained the Potential Reach for people in the United States aged 18 and up, which was displayed to potential advertisers during the Class Period to be more than 200 million people.

### Meta Changed "Potential Reach" to "Estimated Audience Size" (late October 2021 to present)

76.     In or around late October 2021, Meta removed the "Potential Reach" metric and replaced it with a metric called "Estimated Audience Size."

77.     Meta explained the change was to make the Potential Reach figure a range so it would be consistent with the format of the Estimated Daily Results:

---

[33] Facebook Business, Metrics Updates to Offer You More Actionable Business Insights, March 12, 2019 https://www.facebook.com/business/news/metrics-updates-to-offer-you-more-actionable-business-insights.

Facebook provides pre-campaign estimates to help advertisers understand the estimated number of people who meet the targeting and ad placement criteria they select or how their ads may perform depending on those selections. These include Potential Reach, Estimated Daily Results and — if using interest categories — an estimate of the number of people who may have a particular interest.

In order to make the presentation of those pre-campaign estimates consistent, we are changing Potential Reach and interests into ranges instead of specific numbers, which is how Estimated Daily Results are already presented. Ranges are also in line with how pre-campaign estimates are presented on other platforms across the advertising industry. As part of this update, we will also be changing the name of Potential Reach to Estimated Audience Size.[34]

78.     The default Estimated Audience Size, before any targeting criteria is selected, is the Estimated Audience Size for people in the United States aged 18 and up.

79.     On March 31, 2022, Meta's default Estimated Audience Size for people in the United States aged 18 and up was 233,600,000 to 274,900,000, as shown in the screenshot below:



---

[34] https://www.facebook.com/business/news/update-to-our-pre-campaign-estimates (last visited Apr. 14, 2022).

80.     On March 31, 2022, increasing the age range to all people in the United States aged 13 and up increased the Estimated Audience Size to 243,600,000 to 286,600,000, as shown in the screenshot below:



81.     At some time between approximately late October 2021 and the present, Meta added the following language in a popup window that opens when the cursor is placed over the "(i)" next to the Estimated Audience Size figure:

> Estimated audience size is an estimate of how many people may meet your targeting criteria. It is based on factors such as targeting selections, ad placements and how many people were shown ads on Meta apps and services in the past 30 days.
>
> This is not an estimate of how many people will see your ad and is not designed to match population or census data. This metric is in development.

(Blue color in original).

82.     This statement still represents the Estimated Audience Size as a number of "people" in the target audience.

83.     At some time between approximately late October 2021 and the present, Meta added the following language in a second popup window that opened by clicking on the "people" hyperlink in the popup window described in paragraph 81 above:

> **Unique Metrics**
> Unique metrics published on Facebook reporting surfaces are metrics that count the number of people who took an action, rather than the number of actions taken.
>
> These metrics are considered estimated and sampled, and depend on factors such as how many accounts are used by each person on Facebook Company Products. When a person has more than one account and takes actions (such as liking photos or adding comments) on the separate accounts, these actions may be counted separately even though they were made by the same person.
>
> For example, this means that if someone saw a post while using their business Page and then switched to their personal profile and saw the same post, we may count this as 2 people reached. This also means that in cases where a person has connected their Facebook and Instagram accounts in Accounts Center, they will be counted as a single person for ads measurement and estimation purposes, and in cases where a person has not connected their Facebook and Instagram accounts in Account Center, their accounts will be counted as multiple accounts for ads measurement and estimation purposes.
>
> Facebook has a number of systems in place to detect and remove fake accounts. In some cases, the presence of fake accounts may have some impact on unique metrics, such as estimated audience size.

(Blue color in original).

84.     Upon information and belief, this explanation constituted Meta's first time disclosing that it double-counts the same person in its Estimated Audience Size if that person has both a Facebook and Instagram account that are not linked.

85.     Upon information and belief, prior to this statement, Meta did not previously disclose that it was counting as multiple "people" in the Potential Reach/Estimated Audience Size metric one person who could take actions on separate accounts.

86.     Meta has continued to fail to disclose whether the Estimated Audience Size figure provided by Meta includes double-counting people with duplicate Facebook accounts or includes "people" with false accounts.

**<u>Reported Reach</u>**

87.     While an ad campaign is running, and after it has concluded, Meta provides advertisers with metrics, one of which is "Reach."

88.     Meta explains that "Reach" is the number of people who saw the ad at least once, but does not include multiple views of the ad by the same person:



89.     Clicking on "people" in the description above leads to the same description of "Unique Metrics" described in paragraph 83 above, and was added to Meta's website at some time between approximately late October 2021 and the present.

90.     Upon information and belief, this explanation constituted Meta's first time of disclosing that it double-counts the same person in its Reach metrics if that person has both a Facebook and Instagram account that are not linked.

91.     Upon information and belief, prior to this statement, Meta did not previously disclose that it was counting as multiple "people" in the Reach metric one person who saw the same ad on separate Facebook and Instagram accounts.

92.    Meta, to date, continues to define "reach" as "[t]he number of **people** who saw your ads at least once."[35]

93.    Meta still does not disclose whether the Reach figure provided by Meta includes double-counting people with duplicate Facebook accounts or includes "people" with false accounts.

### Meta Widely Disseminates in Commercial Advertising or Promotion the Number of Monthly Active Users, Duplicate Accounts, and False Accounts

94.    As set forth herein, Meta's statements about MAUs, duplicate accounts, and false accounts made in its quarterly and Annual Reports were incorporated into its online resources for consumers, and specifically in its information provided to potential purchasers of advertisements in Ads Manager.

95.    Meta's website provides promotional information to assist potential customers interested in paying Meta to run advertising campaigns.

96.    One such website is Meta's "Business Help Center."

97.    On its Business Help Center website, Meta provides information about its MAU's to potential customers by referring them to Meta's publicly-filed financial reports, specifically stating that "Facebook's quarterly earnings announcements provide this information."[36]

98.    Upon information and belief, Meta has had the same or substantially similar statements on its website since at least mid-March 2019.

99.    Similarly, in the Ads Manager where customers create Facebook ad campaigns, when one places the cursor over the "(i)" next to Estimated Audience Size, then clicks "Learn More" in the popup window, another window appears explaining that the Estimated Audience Size

---

[35] https://www.facebook.com/business/help/710746785663278 (emphasis added) (last visited July 7, 2022).
[36] https://www.facebook.com/business/help/1665333080167380?id=176276233019487 (last visited July 7, 2022).

differs from monthly or daily active users on Facebook, and that "Facebook's quarterly earnings announcements provide this information."

100.    Meta's quarterly earnings announcements, in turn, contain the same descriptions, numbers, and percentages of MAUs, duplicate accounts, and false accounts as Meta's Forms 10-K, and, further, specifically direct readers to: "Please see Facebook's most recent quarterly or annual report filed with the SEC for definitions of user activity used to determine the number of our Facebook DAUs and MAUs."[37]

101.    Thus, Meta directs potential customers interested in purchasing advertising from Meta to its SEC filings to obtain information.

102.    Meta also posts its quarterly and Annual Reports including its Forms 10-K on a separate section of its website.[38]

103.    Thus, Meta's statements about MAUs, duplicate accounts, and false accounts made in its quarterly and Annual Reports, which it incorporated into its online resources for consumers, were statements made in advertisements or promotional materials directed to those persons or businesses making purchasing decisions regarding advertising products offered by Meta.

104.    Meta's statements about MAUs, duplicate accounts, and false accounts made in its quarterly and Annual Reports, which are available through Meta's website, and to which Meta directed consumers buying ads on different parts of its website, were sufficiently disseminated to the purchasing public.

105.    Meta's statements about MAUs, duplicate accounts, and false accounts made in its quarterly and Annual Reports, to which Meta directed consumers buying ads on different parts of

---

[37] FB Earnings Presentation Q4, 2020, p. 2, https://s21.q4cdn.com/399680738/files/doc_financials/2020/q4/FB-Earnings-Presentation-Q4-2020.pdf. Additional quarterly reports available at https://investor.fb.com/financials/?section=quarterlyearnings.
[38] *See* https://investor.fb.com/financials (last visited April 13, 2022).

its website, were designed to influence a purchasing decision by, *inter alia*, giving purchasers an understanding of the number of Meta's MAUs, duplicate accounts, and false accounts during the reported period.

## Meta Widely Disseminated in Commercial Advertising or Promotion the Potential Reach for Advertising Campaigns

106.    In Meta's Ads Manager, where customers create Facebook ad campaigns, the Potential Reach was provided to every advertiser prior to the purchase of an advertisement.

107.    Thus, the Potential Reach figures were made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

108.    Meta's descriptions of Potential Reach as a measure of "people" in an ad's target audience were made in Meta's Ads Manager and elsewhere on its website and online resources for consumers, and, accordingly, were statements made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

109.    Meta's Potential Reach figures and description of Potential Reach as a measure of people in an ad's target audience were sufficiently disseminated to the purchasing public.

110.    Meta's Potential Reach figures and description of Potential Reach were designed to influence a purchasing decision by, among other things, giving purchasers an understanding of the number of people in an ad's target audience.

## Meta Widely Disseminated in Commercial Advertising or Promotion the Estimated Audience Size for Advertising Campaigns

111.    At all times relevant, in Meta's Ads Manager, where customers create Facebook ad campaigns, the Estimated Audience Size was provided to every advertiser prior to the purchase of an advertisement.

112.    Thus, the Estimated Audience Size figures were made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

113.    Meta's descriptions of Estimated Audience Size as a measure of "people" in an ad's target audience were made in Meta's Ads Manager and elsewhere on its website and online resources for consumers, and, accordingly, were statements made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

114.    Meta's Estimated Audience Size figures and description of Estimated Audience Size as a measure of people in an ad's target audience were sufficiently disseminated to the purchasing public.

115.    Meta's Estimated Audience Size figures and description of Estimated Audience Size were designed to influence a consumer's purchasing decision by, *inter alia*, purporting to give purchasers an understanding of the number of people in an ad's target audience.

## Meta Widely Disseminated in Commercial Advertising or Promotion the Achieved Reach for Advertising Campaigns

116.    At all times relevant, in Meta's Ads Manager, where customers create and run Facebook ad campaigns, the actual or achieved Reach was provided to every advertiser during an ongoing advertisement campaign and after the campaign ended.

117.    The achieved Reach figures were made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

118.    Meta's descriptions of Reach as a measure of "people" who saw the ad at least once were made in Meta's Ads Manager and elsewhere on its website and online resources for consumers, and, accordingly, were statements made in advertisements and/or promotional materials directed to those making purchasing decisions from Meta.

119.    Meta's achieved Reach figures and description of Reach as a measure of people who saw the ad at least once were sufficiently disseminated to the purchasing public.

120.    Meta's achieved Reach figures and description of Reach were designed to influence a purchasing decision by, *inter alia*, purporting to give those who purchase ads on Meta a way to measure the number of people who saw the ad at least one time so they can determine whether to run another campaign, make changes to the campaign, and/or choose not to run another campaign.

**The Number of MAUs, the Percentage of Duplicate and False Accounts, the Potential Reach or Estimated Audience Size of an Advertising Campaign, and the Achieved Reach of the Campaign Were Each Material to Advertisers Making Purchasing Decisions**

121.    The number of Meta's MAUs disclosed by Meta was material to advertisers considering purchasing ads on Meta because it informed potential purchasers of the number of Facebook users who have been active in the past month and influenced whether and how the advertiser should use Meta to run an advertising campaign.

122.    The percentage of duplicate accounts disclosed by Meta was material to advertisers considering purchasing ads on Meta because it informed potential purchasers of a percentage of Facebook users who maintain multiple accounts and influenced whether and how the advertiser should use Meta to run an advertising campaign.

123.    The percentage of false accounts disclosed by Meta was material to advertisers considering purchasing ads on Meta because it informed potential purchasers of a percentage of Facebook accounts that are not associated with a real person and influenced whether and how the advertiser should use Meta to run an advertising campaign.

124.    The Potential Reach figures and description provided by Meta was material to advertisers considering purchasing ads on Meta because it purported to inform potential purchasers

of the number of people in an ad's target audience and influenced whether and how the advertiser should use Meta to run an advertising campaign.

125.    The Estimated Audience Size figures and description provided by Meta was material to advertisers considering purchasing ads on Meta because it purported to inform potential purchasers of the number of people in an ad's target audience and influenced whether and how the advertiser should use Meta to run an advertising campaign.

126.    The achieved Reach figures and description provided by Meta was material to advertisers considering purchasing additional ads on Meta because it purported to provide them, during and after an ad campaign, the number of people who saw the ad at least once and influenced whether and how the advertiser should continue with the campaign, whether the advertiser should make adjustments to the ongoing campaign, whether the advertiser should make adjustments to a future campaign, or whether the advertiser should choose not to proceed with a future campaign.

127.    Meta itself acknowledged the importance of the reach metrics, which it emphasized is affected by the ad-buyer's bid, budget and audience targeting:

## How It's Used

Reach gives you a measure of how many people were exposed to your message during an ad campaign. People may not always click on your ads, but they may be more likely to engage with your business when they see your message.

Your reach can be affected by your bid, budget and audience targeting.[39]

---

[39] https://www.facebook.com/business/help/710746785663278 (visited Oct. 28, 2021; last visited July 7, 2022).

128.    In its brand workshops to advertisers, "Facebook suggests that reach is the most important driver of ROI [return on investment] with the power to uplift ROI by 70 percent if reach is maximized."[40]

129.    Likewise, advertisers find reach to be one of the most, if not the most, important metric. For example, "[f]or all Diageo content, reach is the number one metric."[41]

130.    These metrics that Meta provided materially impacted advertising decisions with respect to whether and how to advertise on the Facebook platform, and whether and how to continue advertising on the Facebook platform.

### <u>Meta Has Knowingly Been Underreporting Duplicate and False Accounts and Inflating and Misrepresenting its Active Users</u>

131.    As reflected in its prior annual reports, Meta has reflected a 1% change in its estimate of both duplicate accounts and false accounts.

132.    Yet for years, Meta has, upon information and belief, failed to accurately disclose or update the percentage of duplicate and false accounts in the United States.

133.    Upon information and belief, Meta's reporting that 11% of its MAUs are duplicate accounts is materially understated.

134.    On October 21, 2021, the *Wall Street Journal* released a series of articles detailing internal problems at Meta. One of these articles, "How Many Users Does Facebook Have? The Company Struggles to Figure It Out," detailed the problems Meta had in determining how many individual users, actual persons, were Facebook members.[42]

---

[40] Kizzy Lilburne, "Improving return on investment and measurement on Facebook" *Journal of Digital & Social Media Marketing*, Vol. 4, 4, p. 353 (2017) (citing Brand Workshop held at Facebook's offices, London, Nov. 2015).
[41] *Id.*
[42] Sam Schechner and Jeff Horwitz, "How Many Users Does Facebook Have? The Company Struggles to Figure It Out" *Wall Street Journal*, October 21, 2021 (the "WSJ Article"), *available at* https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

135.    The report indicated that Meta has known that single users with multiple accounts (duplicate accounts) was "very prevalent" and that its internal system for detecting such accounts undercounted them:

> An internal Facebook presentation this spring [2021] called the phenomenon of single users with multiple accounts "very prevalent" among new accounts. The finding came after an examination of roughly 5,000 recent sign-ups on the service indicated that at least 32% and as many as 56% were opened by existing users. The company's system for detecting such accounts also tends to undercount them, according to the presentation, which was viewed by The Wall Street Journal.

136.    The *Wall Street Journal* referenced another internal Meta memorandum from May 2021 acknowledging that Meta's statements of United States MAUs in their 20s exceeded the total population of Americans in their 20s:

> A separate memo from May said that the number of U.S. Facebook users who are in their 20s and active at least once a month often exceeds the total population of Americans their age. "This brings out an elephant in the room: SUMA," the memo's author wrote, using an internal abbreviation for "Single User Multiple Accounts." The author added that the issue could render Facebook's ratio of users active each day "less trustable."[43]

137.    The *Wall Street Journal* also referenced internal Facebook memoranda where "data cited in the documents show that a quarter to a third of duplicates have been what Facebook calls 'persistent SUMA,' where a user continues to operate multiple accounts."[44]

138.    Upon information and belief, Meta's reporting that 5% of its MAUs are false accounts is also materially understated.

139.    For instance, Meta reported that, of its 2.5 billion worldwide MAUs in the fourth quarter of 2019, approximately 5% (125 million) were false accounts.

---

[43] *Id.*
[44] *Id.*

140.    Yet during the fourth quarter of 2019, Meta also reported disabling 1.1 billion active fake accounts.[45]

141.    Likewise, Meta reported that, of its 2.8 billion worldwide MAUs in the fourth quarter of 2020, approximately 5% (140 million) were false accounts.

142.    Yet during the fourth quarter of 2020, Meta also reported disabling 1.3 billion active fake accounts.[46]

143.    Likewise, Meta reported that, of its 2.91 billion worldwide MAUs in the fourth quarter of 2021, approximately 5% (145.5 million) were false accounts.

144.    Yet during the fourth quarter of 2021, Meta also reported disabling 1.7 billion active fake accounts.[47]

145.    Furthermore, Meta's estimate of active fake accounts has remained consistent at 5% for years even as the number of accounts it takes down each quarter fluctuates widely and as Meta has "deployed new A.I. tools that do a better job of identifying fake accounts . . . ."[48]

146.    For example, Meta disabled 2.2 billion fake accounts in the first quarter of 2019; 1.5 billion in the second quarter; 1.7 billion in the third quarter, and 1.1 billion in the fourth quarter. The following year, it disabled 1.7 billion fake accounts in the first quarter of 2020; 791 million in the second quarter; and 1.3 billion in the third and fourth quarters.[49]

---

[45]    https://transparency.fb.com/data/community-standards-enforcement/fake-accounts/facebook/#content-actioned (last visited June 27, 2022); *see also* https://transparency.fb.com/policies/improving/content-actioned-metric/ (explaining that Meta reports the number of fake accounts that were created (i.e. active) and which it disabled, and that the figure excludes instances in which Meta blocked accounts from being created (i.e. active) in the first place).
[46] *Id.*
[47] *Id.*
[48] Mark Zuckerberg Testimony before U.S. Senate Commerce and Judiciary Committees, Apr. 10, 2018, *available at* https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/; *See also* Jack Nicas, "Does Facebook Really Know How Many Fake Accounts It Has?" *The New York Times*, Jan. 30, 2019, *available at* https://www.nytimes.com/2019/01/30/technology/facebook-fake-accounts.html.
[49]    https://transparency.fb.com/data/community-standards-enforcement/fake-accounts/facebook/#content-actioned (last visited June 27, 2022).

147.     Upon information and belief, Meta has known since at least 2018 that its disclosed 11% duplicate account rate is understated.

148.     Upon information and belief, Meta has known since at least 2018 that its disclosed 5% false account rate is understated.

149.     Thus, the percentages of duplicate and false accounts reported by Meta are false and/or misleading in context.

150.     Upon information and belief, Meta's suggestion that the percentage of duplicate accounts is lower in developed countries including the United States is false and/or misleading in context.

151.     To the extent that Meta's calculation of MAUs in the United States and Canada incorporated the reported 11% duplicate account figure and the 5% false account figure, the use of the understated percentage in the calculation resulted in inflated MAU figures.

152.     To the extent Meta did not incorporate the reported 11% duplicate account figure and the 5% false account figure into the calculation of MAUs in the United States and Canada, but left this calculation to the advertiser, the understated reported percentages resulted in inflated MAU figures.

153.     To the extent Meta suggests that the 11% duplicate account figure and the 5% false account figure is lower in developing countries like the United States and Canada, and that some lower percentage of duplicate and fake accounts is or should be applied to the disclosed MAU figure, such understated percentages resulted in inflated MAU figures.

154.     Thus, Meta's reported MAUs in the United States and Canada are false and/or misleading in context.

**Meta Has Knowingly Been Inflating and Misrepresenting its Potential Reach,**
**Estimated Audience Size, and Achieved Reach**

155.    Prior to approximately late October 2021, Meta never disclosed that the Potential Reach figures and achieved Reach figures included duplicate and false accounts and, thus, were not an accurate measure of "people" in the target audience or "people" who saw the ad at least once.

156.    Meta's changing definitions of Potential Reach, its decision to change Potential Reach to Estimated Audience Size, and its attempt to clarify the definitions for these terms, reflect its knowledge that these numbers were overstated and were not a measure of "people."

157.    Yet none of the changes made by Meta have resolved the inflation that occurred in the Potential Reach figures, and that is still occurring in the Estimated Audience Size and achieved Reach metrics.

158.    For example, it was not until approximately late October 2021 that Meta began stating that the numbers in the Estimated Audience Size may include actions taken by one person on multiple accounts, which Meta counts as two people: "When a person has more than one account and takes actions (such as liking photos or adding comments) on the separate accounts, these actions may be counted separately even though they were made by the same person."

159.    The new language introduced by Meta in approximately October 2021 made clear that, prior to that point, Meta was stating in its advertising and promotion that Potential Reach and achieved Reach were figures representing "people" when Meta was inaccurately counting one person with multiple accounts as more than one person.

160.    Thus, by its own subsequent admission, Meta's statement that Potential Reach was a measure of "people" was false.

161.    Thus, by its own subsequent admission, Meta's reported Potential Reach figures were false.

162.    Thus, by its own subsequent admission, Meta's statement prior to approximately late October 2021 that the achieved Reach was a measure of "people" was false.

163.    Thus, by its own subsequent admission, Meta's reported Reach figures prior to approximately late October 2021 were false.

164.    To the extent that Meta's calculation of Potential Reach, Estimated Audience Size, and/or achieved Reach incorporated the reported 11% duplicate account figure and the 5% false account figure, the use of the understated percentage in the calculation resulted in inflated Potential Reach, Estimated Audience Size and achieved Reach figures.

165.    To the extent Meta did not incorporate the reported 11% duplicate account figure and the 5% false account figure into the calculation of Potential Reach, Estimated Audience Size, and/or achieved Reach, but left this calculation to the advertiser, the understated reported percentages resulted in inflated Potential Reach, Estimated Audience Size, and achieved Reach figures.

166.    Moreover, Meta's revised statements from October 2021 still did not disclose whether Meta was double-counting as multiple "people" unauthorized duplicate accounts, or only "authorized" duplicate accounts, such as actions taken by one person on a personal page and on a business page.

167.    The post-October 2021 statements on Meta's website referred, and continue to refer, to a "person" with more than one account, and do not disclose if the Estimated Audience Size and achieved Reach figures include or remove false accounts, which are non-human, bots, or spam accounts.

168.     To the extent the Estimated Audience Size and achieved Reach metrics removed (or presumed the advertiser would remove) Meta's reported 5% false account figure, the metrics are still inflated because the false account rate is higher than 5%.

169.     The change in language on Meta's website in October 2021 is also an admission by Meta that Meta's Potential Reach, Estimated Audience Size, and achieved Reach metrics were not, and are still not, actually an estimate of *people*, but instead an estimate of "accounts."

170.     Nonetheless, Meta has continued to advertise Estimated Audience Size and achieved Reach as a measure of "people," only providing the insufficient qualifying language described above with further click-through menus.

171.     Thus, Meta's statement that the Estimated Audience Size is a measure of "people" is false and/or misleading in context.

172.     Thus, the Estimated Audience Size figures provided by Meta are false and/or misleading in context.

173.     Likewise, Meta's statements after late October 2021 that the achieved Reach is a measure of "people" and the reported Reach figures are false and/or misleading in context.

**Meta's False and/or Misleading Statements Regarding MAUs, Duplicate Accounts, and False Accounts Cause Unfair Competition with Metroplex and the Class**

174.     Metroplex and the Class Members are competitors of Meta.

175.     A person looking to place digital ads to reach a targeted audience of people could choose to use Metroplex or other Class Members rather than Meta to do so.

176.     During the Class Period, Meta's reported 11% duplicate account rate, 5% false account rate, and number of MAUs in the United States and Canada, which were each disclosed in its quarterly and Annual Reports including in its Forms 10-K, and which were referenced and

disseminated on its website, were false or misleading descriptions of fact, or false or misleading representations of fact, used in commerce in connection with goods or services.

177.    During the Class Period, Meta's reported 11% duplicate account rate, 5% false account rate, and number of MAUs in the United States and Canada, which were each disclosed in its quarterly and Annual Reports including in its Forms 10-K, and which were referenced and disseminated on its website, were false and/or misleading statements of fact by Meta in a commercial advertisement or promotion about its own product.

178.    Meta's reported 11% duplicate account rate, 5% false account rate, and number of MAUs in the United States and Canada disclosed in these quarterly and Annual Reports and on its website actually deceived or had the tendency to deceive a substantial segment of its audience.

179.    Meta's reported 11% duplicate account rate, 5% false account rate, and number of MAUs in the United States and Canada disclosed in these quarterly and Annual Reports and on its website were material, in that they were likely to influence the purchasing decision of Meta's customers.

180.    Meta caused its false and/or misleading statements to enter interstate commerce.

181.    During the Class Period, Meta has known these statements to be false and/or misleading and has intentionally and willfully continued to make them.

182.    In the alternative, even if Meta's conduct was unintentional, Meta knew or should have known these statements were false and/or misleading.

183.    Meta's material understatement of duplicate accounts, understatement of false accounts, and overstatement of MAUs in the United States and Canada, has enabled it to obtain advertising and paid content revenue and profit to the detriment of its competitors.

184.    Metroplex and the Class Members have been or are likely to be injured as a result of the false and/or misleading statements, either by direct diversion of sales from themselves to Meta and/or by lessening of the goodwill associated with their products.

### Meta's False and/or Misleading Statements Regarding Potential Reach, Estimated Audience Size, and Achieved Reach Cause Unfair Competition with Metroplex and the Class

185.    Meta's Potential Reach figures and description, its Estimated Audience Size figures and description, and/or its achieved Reach figures and description provided to ad buyers during the Class Period were false or misleading descriptions of fact, or false or misleading representations of fact, used in commerce in connection with goods or services.

186.    Meta's Potential Reach figures and description, its Estimated Audience Size figures and description, and/or its achieved Reach figures and description provided to ad buyers during the Class Period were false and/or misleading statements of fact by Meta in a commercial advertisement or promotion about its own product.

187.    Meta's Potential Reach figures and description, its Estimated Audience Size figures and description, and/or its achieved Reach figures and description provided to ad buyers during the Class Period actually deceived or had the tendency to deceive a substantial segment of its audience.

188.    Meta's Potential Reach figures and description, its Estimated Audience Size figures and description, and/or its achieved Reach figures and description provided to ad buyers during the Class Period were material, in that they were likely to influence the purchasing decision of consumers buying digital advertisements.

189.    Meta caused its false and/or misleading statements to enter interstate commerce.

190.    During the Class Period, Meta has known these statements to be false and/or misleading and has intentionally and willfully continued to make them.

191.    In the alternative, even if Meta's conduct was unintentional, Meta knew or should have known these statements were false and/or misleading.

192.    Meta's false and/or misleading figures and descriptions related to Potential Reach, Estimated Audience Size and/or achieved Reach have enabled it to obtain advertising and paid content revenue and profit to the detriment of its competitors.

193.    Metroplex and the Class Members have been and/or are likely to be injured as a result of the false and/or misleading statements, either by direct diversion of sales from themselves to Meta and/or by lessening of the goodwill associated with their products.

## CLASS ALLEGATIONS

194.    Metroplex brings this action on behalf of itself and all others similarly situated, as a representative of the following class (the "Class"):

> All persons (including entities) in the United States who, during the Class Period, (a) operated a website or phone app and (b) sold advertisements to third-parties to display on such website or app.

195.    Metroplex brings this action on behalf of itself and all others similarly situated, as a representative of the following subclass (the "Subclass"):

> All Class Members who are Illinois citizens.[50]

196.    Excluded from the Class are Meta, any employees of Meta, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Meta. Also excluded are the judges, court personnel, and jury in this case, and any members of their immediate families.

197.    Metroplex reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

---

[50] Unless otherwise indicated, the Class and Subclass are collectively referred to as the Class.

198.     The Class Period is that period within the statute of limitations for this action and extending until a Class is certified herein.

199.     The Class is certifiable under Fed. R. Civ. P. 23.

200.     **Numerosity.** The members of the Class are so numerous that joinder of all members is impractical.

201.     **Typicality.** Metroplex's claims are typical of the claims of the Class Members. Metroplex and all Class Members have had their rights violated based on Meta's unfair competition as set forth herein.

202.     **Commonality and Predominance.** There are questions of law and fact common to the Class, which predominate over any questions affecting individual members of the Class. These common questions of law and fact include, without limitation:

> a.      Whether any or all of the statements described above regarding duplicate accounts, false accounts, MAUs, Potential Reach, Estimated Audience Size, and achieved Reach were false or misleading statements of fact in a commercial advertisement or promotion about Meta's own product;
>
> b.      Whether the statement(s) were material;
>
> c.      Whether the statement(s) actually deceived or had the tendency to deceive Meta's customers;
>
> d.      Whether the deception was material, in that it was likely to influence the purchasing decision of Meta's customers;
>
> e.      Whether Meta caused its false or misleading statement(s) to enter interstate commerce;
>
> f.      Whether Metroplex and the Class have been or are likely to be injured as a result of the false or misleading statement(s), either by direct diversion of sales from themselves to Meta or by a lessening of the goodwill associated with their products;
>
> g.      Whether Meta's profits should be disgorged, and in what amount; and
>
> h.      Whether Meta should be enjoined from continuing to make false or misleading statements.

203.    **Adequacy.** Metroplex is a member of the Class and Subclass it seeks to represent, committed to the vigorous prosecution of this action, and has retained competent counsel experienced in the prosecution of class actions. Metroplex has no conflicts of interest with other class members and is an adequate representative who will fairly and adequately protect the interests of the Class and Subclass.

204.    **Superiority.** A class action is a superior method for the fair and efficient adjudication of the controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Meta, Class members are unlikely to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and the misconduct of Meta will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Metroplex knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

205.    **Class Action on Limited Issues.** Because there are common individual issues among the Class, it is appropriate for this action to be maintained as a class action with respect to particular issues if necessary. *See* Fed. R. Civ. P. 23(c)(4).

## COUNT I

### Violation of the Lanham Act (15 U.S.C. § 1125(a))

206.    Metroplex incorporates and realleges each paragraph above as if fully set forth herein.

207.    In acting as set forth above, Meta violated section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B), in connection with its sale of advertising services, by using in commerce words, terms, names, symbols, or devices, or any combination thereof, false or misleading descriptions of fact, and/or false or misleading representations of fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, and/or qualities of Meta's goods, services, or commercial activities.

208.    The figures and statements described above regarding Meta's percentage of duplicate accounts, percentage of false accounts, MAUs in the United States and Canada, Potential Reach, Estimated Audience Size, and achieved Reach were and remain materially false and/or misleading statements of fact in commercial advertisements or promotions about Meta's own product.

209.    The false and/or misleading statements actually deceived or had the tendency to deceive a substantial segment of Meta's audience.

210.    The false and/or misleading statements were and are likely to influence the purchasing decision of Meta's customers.

211.    Meta caused its false and/or misleading statements to enter interstate commerce.

212.    The false and/or misleading statements by Meta are related to facts that consumers purchasing advertisements consider to be the most important—the size of the target audience and

the number of people potentially and actually reached in an advertising campaign. Accordingly, Meta has significantly benefited from the false and/or misleading statements.

213.   For example, in February 2015, Meta had approximately 2 million active advertisers on Facebook.[51] By the second quarter of 2018, Meta had 6 million advertisers on Facebook.[52] By the third quarter of 2020, Meta had "more than 10 million active advertisers across [its] services every month – the vast majority of which are small and medium-sized businesses."[53]

214.   According to Meta's own data published on its website, in the 90 days between March 27, 2022 and June 27, 2022, Meta earned more than $169,000,000 from people or entities running ads solely about social issues, elections, or politics in the United States. Of these, over 16,000 different people or entities ran ads about social issues, elections, or politics to reach people in Illinois. These advertisers of social issues, elections, or politics trying to reach Illinois audiences paid Meta $7,098,216 during this 90-day period—or $78,869.06 per day.[54] Extrapolating these nationwide 90-day figures to a yearly amount means Meta would make about $685,388,888.89 of revenues from U.S. ads about social issues, elections, or politics, which is approximately 1.4% of the $48 billion of total U.S. advertising revenues received in 2021.

215.   Metroplex and the Class have been, and/or are likely to be, injured as a result of the false and/or misleading statements, either by direct diversion of sales from themselves to Meta or by a lessening of the goodwill associated with their products.

---

[51] Meta for Business, "Thank You," Feb. 24, 2015, https://www.facebook.com/business/news/two-million-advertisers.
[52] Meta 2Q 2018 Earnings Call Transcript, p. 22, *available at* https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q2/Q218-earnings-call-transcript.pdf.
[53] Meta 3Q 2020 Earnings Call Transcript, p. 5, *available at* https://s21.q4cdn.com/399680738/files/doc_financials/2020/q3/FB-Q3-2020-Earnings-Call-Transcript.pdf. The Earnings Transcripts are currently available on Meta's website at https://investor.fb.com/financials/default.aspx.
[54] Report available at https://www.facebook.com/ads/library/report/?source=archive-landing-page&country=US (last accessed June 27, 2022).

216.    Meta has, for years, willfully made and had direct knowledge of its false and/or misleading statements, internally discussed changing its statements, and willfully chose not to do so to avoid losing customers and revenue.

217.    As set forth above, Meta willfully continues to make false and/or misleading statements to unfairly compete with Metroplex and the Class.

218.    In the alternative, even if Meta's conduct was unintentional, Meta knew or should have known these statements were false and/or misleading.

219.    Pursuant to 15 U.S.C. § 1117, Metroplex and the Class are entitled to recover Meta's profits and the costs of this action.

220.    Pursuant to 15 U.S.C. § 1117, this is an exceptional case warranting the recovery of Metroplex and the Class Members' reasonable attorneys' fees.

221.    Meta's unfair competition is continuing and Metroplex and the Class face a risk of future harm with no adequate legal remedy given the ongoing false and/or misleading statements by Meta. As a result, and in addition to the relief described above, Metroplex and the Class seek injunctive relief pursuant to 15 U.S.C. § 1116.

WHEREFORE, Metroplex and the Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT II

## Violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.*)

222.    Metroplex incorporates and realleges each paragraph above as if fully set forth herein.

223.    As set forth above, Meta engaged in deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2, by, in the course of its business:

a.      representing that its goods or services have characteristics,

benefits, or quantities that they do not have;

b.      advertising its goods or services with intent not to sell them

as advertised; and/or

c.      engaging in other conduct that created a likelihood of

confusion or misunderstanding.

224.    As set forth herein, Meta willfully engaged in the above-described deceptive trade practices with the intent to deceive consumers.

225.    In the alternative, even if Meta's conduct was unintentional, it still has resulted in deceptive trade practices prohibited by Illinois law.

226.    Metroplex and the Subclass Members are likely to be damaged by Meta's deceptive trade practices.

WHEREFORE, Metroplex and the Subclass pray for the relief requested in the Prayer for Relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Metroplex, on behalf of itself, the Class, and Subclass, pray for judgment against Meta as follows:

A.      entering an order certifying the Class and Subclass as requested herein and appointing the undersigned as lead counsel for the Class and Subclass;

B.      awarding Metroplex and the Class injunctive relief, including, but not limited to, enjoining Meta from continuing the unlawful practices as set forth herein and ordering Meta to engage in a corrective advertising campaign;

C.  awarding Metroplex and the Class compensation in the form of Meta's profits pursuant to 15 U.S.C. § 1117(a);

D.  awarding Metroplex and the Class its costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) and/or 815 ILCS 510/3;

E.  awarding Metroplex and the Class any pre-judgment and post-judgment interest, as provided by law; and

F.  awarding such other and further relief as is just and appropriate.

## **JURY DEMAND**

Metroplex demands a trial by jury on all claims so triable.

Dated: July 8, 2022                          Respectfully submitted,

**GOLDENBERG HELLER**
**& ANTOGNOLI, P.C.**

By: _/s/ Kevin P. Green_____
Thomas P. Rosenfeld #06301406
Kevin P. Green #06299905
Thomas C. Horscroft #06327049
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
tom@ghalaw.com
kevin@ghalaw.com
thorscroft@ghalaw.com

**MARGULIS GELFAND, LLC**

By: _/s/ Justin K. Gelfand_____
Justin K. Gelfand
Ian T. Murphy
Gregory P. Bailey
7700 Bonhomme Avenue, Suite 750
Clayton, MO 63105
314-390-0234
justin@margulisgelfand.com
ian@margulisgelfand.com
greg@margulisgelfand.com